IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| RECOVERYX LIVINGSTON L.L.C. FOR ASSIGNEES OF CITIZENS OF LIVINGSTON FOR FAIR AND EQUITABLE RELIEF AND RESIDENTS OF THE CITY OF LIVINGSTON, | § § § § § § § § § § § § § § § | CIVIL ACTION NO. 9:24-CV-00193 JUDGE MICHAEL J. TRUNCALE |
| *Plaintiff*, | | |
| v. | | |
| CITY OF LIVINGSTON AND SAM RAYBURN MUNICIPAL POWER AGENCY, | | |
| *Defendants*. | | |

**MEMORANDUM OPINION AND ORDER**

# TABLE OF CONTENTS

I.    FACTUAL BACKGROUND.................................................................................................2

II.   PROCEDURAL HISTORY ...............................................................................................4

III.  LEGAL STANDARDS .....................................................................................................5

   A.   Federal Rule of Civil Procedure 12(b)(6).................................................................5

   B.   Federal Rules of Civil Procedure 59(e) and 54(b)...................................................6

IV.   DISCUSSION....................................................................................................................8

   A.   Availability of Requested Relief ...............................................................................8

   B.   Antitrust Standing.....................................................................................................9

      i.    Antitrust Injury ...................................................................................................9

      ii.   The Indirect Purchaser Rule ............................................................................10

         1.    The "Conspiracy Exception"—or Lack Thereof ........................................12

   C.   The State Action Doctrine ......................................................................................14

      i.    Texas Law Regulating Provision of Electricity................................................15

      ii.   Challenged Conduct.........................................................................................17

   D.   Failure to State Claims...........................................................................................19

      i.    Claims under Sherman Act Section 1 and Clayton Act Section 3..................19

         1.    Specific Claims in the Third Amended Complaint.....................................19

         2.    Analysis–No Tying Alleged .......................................................................21

      ii.   Monopolization under Section 2 of the Sherman Act .....................................23

         1.    Analysis—No Anticompetitive Conduct....................................................25

V.    CONCLUSION................................................................................................................28

Before the Court is Plaintiff RecoveryX Livingston L.L.C. ("RecoveryX")'s Rule 59(e) Motion to Alter or Amend the Judgment and, Alternatively, Rule 54 Motion for Reconsideration and Motion to Certify Interlocutory Appeal (the "Motion"). [Dkt. 58]. For the following reasons, the Court **DENIES** the Motion.

## I.  FACTUAL BACKGROUND

This is an antitrust case challenging municipal electricity rates.[1]

The Sam Rayburn Municipal Power Agency ("SRMPA") is a municipal energy provider. [Dkt. 35 at ¶ 1]. It supplies wholesale electricity to the City of Livingston ("Livingston") as well as non-party cities Jasper and Liberty. *Id.* at ¶¶ 1, 24. Livingston then sells this power at retail rates to its inhabitants. *Id.* at ¶ 1. All three cities share ownership over SRMPA and serve as its approving board members via elected city council members. *Id.* at ¶¶ 21, 24. They together approved the electrical contracts at issue in this case. *Id.* at ¶ 24.

RecoveryX is a Texas limited liability company representing individuals and entities that "(a) suffered losses due to the overcharges above the cost of electric service at a property location wherein the Assignor is the owner, resident, or otherwise an interest holder; and (b) were parties to services rendered by the City of Livingston." *Id.* at ¶¶ 4, 9. Individuals and entities contractually assigned to RecoveryX the rights to their claims, and RecoveryX prosecutes this matter on the assignors' behalf. *Id.* at ¶¶ 5, 17.

RecoveryX highlights a series of contracts it believes contravene federal and Texas law. The first contract is between SRMPA, EWO Marketing, Inc. ("Entergy"), and Vinton Public Power Authority ("Vinton"). *Id.* at ¶ 28. That agreement "obligates the Cities of Livingston, Liberty,

---

[1] The Third Amended Complaint is frequently unclear in its statements of how the contracts connect and what actions can be attributed to which parties. At this stage (reconsideration of an order granting in part motions to dismiss) the Court interprets the Third Amended Complaint in the light most favorable to the plaintiff and attempts such an interpretation in its recitation of the facts. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007).

Jasper, and [Vinton] to purchase power and various services through [Entergy]." *Id.* (alterations added). RecoveryX also complains that this contract "provides exclusivity provisions to exclude SRMPA and Cities ability [*sic*] to purchase commodity goods . . . of competitors." *Id.* (alterations added). In other words, the three cities and Vinton are required to purchase their electricity from Entergy, and *only* from Entergy.

This agreement refers to The Cambridge Project ("Cambridge"), which is the second agreement RecoveryX includes in its Third Amended Complaint. *Id.* at ¶ 29. Cambridge is "an LLC which collects the profits from the three large industrial sales (Conoco, CITCO and Sasol) and then distributes the money to the cities of Livingston, Jasper and Liberty from those sales through [SRMPA] and a series of 'trust accounts.'" *Id.* at ¶ 30. Livingston's receipt of trust account distributions is conditioned on its purchasing electricity[2] exclusively through Entergy. *Id.* at ¶ 31.

The third and final agreement with which RecoveryX takes issue is the overall rate Livingston pays SRMPA for wholesale electrical power. RecoveryX's members pay, on average, 15% more for electricity than others similarly situated. *Id.* at ¶ 42. RecoveryX posits Livingston and SRMPA agreed to these higher rates, and did not leave the contract (as they could have) because doing so would mean a loss of trust account distributions. *Id.* at ¶ 34. RecoveryX argues this overcharge, combined with the trust accounts and exclusivity provisions, "pads the profits of Entergy as well as the Cities' general slush funds." *Id.* at ¶ 31.

Livingston uses this "slush fund" to waive *ad valorem* taxes. *Id.* at ¶ 42. However, not all of Livingston's residents own real property, so some do not benefit from the lack of *ad valorem* taxes. *Id.* Because those who own property tend to be wealthier, RecoveryX theorizes, the higher electrical rates benefit wealthier residents while penalizing poorer ones. *Id.* at ¶ 43.

---

[2] Along with "transmission charges, capacity charges, fuel charges, ancillary services charges, imbalance charges and other contract related charges." [Dkt. 35 at ¶ 31].

## II. PROCEDURAL HISTORY

RecoveryX brought this lawsuit in Texas state court on September 4, 2024. [Dkt. 2]. SRMPA, with Livingston's consent, removed the case to this Court on October 9, 2024. [Dkt. 1]. RecoveryX made a series of amendments to its initial state court petition, which culminated in the live Third Amended Complaint. [Dkt. 35]. The Third Amended Complaint alleges a variety of state and federal claims, including (1) Texas common law claims for unreasonable and discriminatory rates under *San Antonio Independent School District v. City of San Antonio*[3] and *City of Texarkana v. Wiggins*,[4] (2) monopoly maintenance in violation of the Texas Free Enterprise and Antitrust Act,[5] (3) unjust enrichment, (4) a Section 1 violation under the Sherman Antitrust Act,[6] (5) a Section 2 violation under the Sherman Antitrust Act,[7] (6) a Section 3 violation under the Clayton Act,[8] and (7) unconstitutional taking under both the Fifth Amendment to the United States Constitution[9] and Article 1, Section 17 of the Texas Constitution.[10] [Dkt. 35 at ¶¶ 44–78].

SRMPA and Livingston filed separate motions to dismiss the Third Amended Complaint. [Dkts. 42, 46]. The Court granted those motions as to the federal claims and remanded the state claims for further proceedings on August 11, 2025. [Dkt. 57]. RecoveryX then filed on August 25 the present Motion challenging the Court's Order, requesting the Court alter its rulings on the antitrust claims only. [Dkt. 58]. SRMPA and Livingston filed their responses on September 8,

---

[3] 550 S.W.2d 262 (Tex. 1976).

[4] 246 S.W.2d 622 (Tex. 1952).

[5] TEX. BUS. & COM. CODE § 15.21.

[6] 15 U.S.C. § 1.

[7] *Id.* at § 2.

[8] *Id.* at § 14.

[9] U.S. CONST. AMEND. V.

[10] TEX. CONST. ART. 1, § 17.

2025. [Dkts. 61, 62]. The Court held a hearing on the Motion on February 19, 2026. [Dkt. 64]. The Motion is now ripe for review.

### III. LEGAL STANDARDS

RecoveryX filed the present Motion requesting that the Court alter its prior Order dismissing its federal claims. [Dkts. 57, 58]. That Order dismissed those claims under Federal Rule of Civil Procedure 12(b)(6). [Dkt. 57]. Two legal standards are therefore relevant: one pertaining to motions to dismiss under Rule 12(b)(6), and one governing motions to reconsider under Rules 59(e) and 54(b).

### A.  Federal Rule of Civil Procedure 12(b)(6)

Courts may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In considering a 12(b)(6) motion, the Court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Sonnier*, 509 F.3d at 675 (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)). In doing so, the Court cannot "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (citations omitted).

To survive a 12(b)(6) challenge, a complaint must allege "enough [well-pleaded] facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (Souter, J., dissenting) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* FED. R. CIV. P. 8(a)(2) ("A pleading that states a claim for relief must contain[] . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). A claim is "plausible on its face" if its well-pleaded facts lead to "the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). By contrast, "if a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility." *Id.* (cleaned up). Determining whether a

5

plausible claim exists is "a context-specific task that requires the . . . [C]ourt to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

### B.  Federal Rules of Civil Procedure 59(e) and 54(b)

RecoveryX requests the Court revisit its Order pursuant to Federal Rules of Civil Procedure 59(e) and 54(b). [Dkt. 58 at 7–8]. Rules 59(e) and 54(b) allow a federal district court to revise a prior judgment or order respectively. "Rule 59(e) governs motions to alter or amend a final judgment; Rule 54(b) allows parties to seek reconsideration of interlocutory orders and authorizes the district court to revise at any time any order or other decision that does not end the action." *Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 336 (5th Cir. 2017) (citation modified).

Rule 54(b) is inapplicable. RecoveryX seeks that the Court reconsider its Order and, in the alternative, grant leave for interlocutory appeal. [Dkt. 58 at 13 ("To the extent that the Court believes that its order of August 11, 2025 is not an appealable order, RecoveryX respectfully asks the Court to reconsider the order under Rule 54(b) or, alternatively, direct the entry of a final judgment on RecoveryX's antitrust claims and expressly allow RecoveryX to appeal the dismissal of its antitrust claims to the Fifth Circuit.")]. The Order with which RecoveryX takes issue dismissed RecoveryX's federal claims and remanded the state claims. [*See generally* Dkt. 57]. An order dismissing federal claims and remanding the case to state court is already considered a final, appealable order. *See Haase v. Countrywide Home Loans, Inc.*, 748 F.3d 624, 628–29 (5th Cir. 2014) (explaining finality in the remand context). Rule 54(b), which concerns both reconsideration and leave for appeal of interlocutory orders, has no place. Thus, the Court only discusses Rule 59(e).

Federal Rule of Civil Procedure 59(e) governs motions to alter or amend judgment. Under Rule 59(e), courts may reconsider their rulings when: (1) there has been an intervening change in controlling law; (2) there is new evidence not previously available; or (3) there is a need to correct

6

a clear error of law or prevent manifest injustice. *In re Benjamin Moore & Co.*, 318 F.3d 626, 629 (5th Cir. 2002). "[S]uch a motion is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004) (alteration added) (citing *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990)). "District court opinions 'are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure.'" *Shenzen Synergy Digital Co. v. Mingtel, Inc.*, No. 4:19-CV-00216, 2022 WL 2252585, at *2 (E.D. Tex. June 22, 2022) (Mazzant, J.) (quoting *Hernandez v. Rush Enters., Inc.*, No. 4:19-CV-638, 2021 WL 1163725, at *1 (E.D. Tex. Mar. 26, 2021)). "Rule 59(e) . . . 'may not be used to relitigate old matters . . . .'" *Ward v. Dir., TDCJ-CID*, No. 6:17CV537, 2019 WL 4673302, at *4 (E.D. Tex. May 22, 2019) (Clark, J.) (alteration added) (quoting *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008)).

A district court has "considerable discretion in deciding whether to reopen a case under Rule 59(e)." *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 355 (5th Cir. 1993). But this discretion is not unbounded; when considering a motion to alter or amend judgment, "[t]he court must strike the proper balance between two competing imperatives: (1) finality, and (2) the need to render just decisions on the basis of all the facts." *Id.* "Reconsideration of a judgment . . . is an extraordinary remedy that should be used sparingly." *Templet*, 367 F.3d at 479 (citation omitted).

## IV. DISCUSSION

RecoveryX asks that the Court alter its dismissal of its federal antitrust claims.[11] [Dkt. 58 at 9]. SRMPA and Livingston argue the Court did not err in dismissing those claims. [Dkts. 61, 62]. The Court discusses each argument below.

### A. Availability of Requested Relief

Before discussing the briefed arguments, the Court first notes an unnoticed problem in the Third Amended Complaint: RecoveryX asks for damages it cannot receive. "[L]ocal government[s]," such as a "city, county, parish, town, township, village," or even "a school district, sanitary district, or any other special function governmental unit established by State law" are not liable for antitrust damages, including attorney's fees. 15 U.S.C. § 35 ("No damages, interest on damages, costs, or attorney's fees may be recovered under Section 4, 4A, or 4C of the Clayton Act (15 U.S.C. 15, 15a, or 15c)"); 15 U.S.C. § 15 (providing for damages for "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws"). *See also Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F.4th 1262, 1277–78 (9th Cir. 2022) (finding an Arizona "agricultural improvement district" to be "exempt from antitrust damages"). The only available relief is injunctive or declaratory; however, the Third Amended Complaint only requests monetary relief and does not distinguish between the Defendants.[12] [Dkt. 35 at ¶ 82].

---

[11] Because RecoveryX cabins its request to the antitrust claims and does not mention the federal takings claim, the Court does not revisit the Order's takings analysis. [Dkts. 57 at 13–14, 58 at 9–20]. Nor does it revisit the state law claims, which the challenged Order remanded to state court. [Dkt. 57 at 14–15].

[12] Assuming that SRMPA is not a local government entity, which given its municipal ownership may very well be. [*See* Dkt. 35 at ¶ 24 ("[SRMPA] is 100% owned by the cities of Livingston, Jasper, and Liberty, and supplies 100% of the power available to these cities.") (alteration added)]. *See also Ellis*, 24 F.4th at 1277–78.

### B. Antitrust Standing

There are also two prudential standing flaws in this case: failure to allege antitrust injury and indirect purchaser status. An antitrust plaintiff, regardless of the claim, must meet three elements: "'1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit.'" *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 488 (5th Cir. 2022) (Duncan, J.) (quoting *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997)). From the face of the Third Amended Complaint, RecoveryX fails the second and third factors. Each are discussed below.

### i. Antitrust Injury

Antitrust does not "'purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.'" *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) (quoting *Hunt v. Crumboch*, 325 U.S. 821 (1945)). To bring an *antitrust* claim, a plaintiff must have an *antitrust* injury. "Antitrust injury" means "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489 (1977)) (citation modified). An injury is not an antitrust injury "unless it is attributable to an anti-competitive aspect of the practice under scrutiny, 'since it is inimical to the antitrust laws to award damages' for losses stemming from continued competition." *Id.* (quoting *Cargill, Inc. v. Monfort, Inc.*, 479 U.S. 104, 109–10 (1986)). The principle that antitrust protects "'*competition*, not *competitors*'" serves as guidance. *Id.* at 338 (emphasis in original) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).

RecoveryX states that its members "have suffered antitrust injury," because they are "paying artificially high rates that they wouldn't have otherwise incurred as a result of the antitrust

conduct." [Dkt. 35 at ¶¶ 54, 60, 62]. A defendant's charging of supracompetitive prices, standing alone, does not inflict antitrust injury and is not anticompetitive conduct.[13] *See Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (Scalia, J.) (discussing the difference between the charging of high prices and anticompetitive conduct in the Section 2 context). To be an antitrust injury, high prices must be *connected* to anticompetitive conduct. *Trinko*, 540 U.S. at 407; *Atl. Richfield*, 495 U.S. at 334. For reasons the Court discusses below in Section IV.D.ii, *infra*, there is no anticompetitive conduct connected to those high prices.[14]

Without an antitrust injury RecoveryX does not have antitrust standing; for this reason alone the Court would be justified in dismissing its antitrust claims.

### ii.    *The Indirect Purchaser Rule*

The indirect purchaser rule goes to the third element of antitrust standing: proper plaintiff status. While RecoveryX's members are *direct* purchasers of electricity from Livingston, they are *indirect* purchasers of SRMPA (which sells the electricity to Livingston). RecoveryX therefore has a second antitrust standing issue as regards its claims against SRMPA.

In *Illinois Brick Co. v. Illinois*, the Supreme Court considered and rejected the possibility of allowing indirect purchasers to sue an upstream antitrust violator. 431 U.S. 720 (1977). *Illinois Brick*'s reasoning is worth noting.

The *Illinois Brick* Supreme Court had a few misgivings about allowing indirect purchasers to sue:[15] it believed such a rule was infeasible, could not make victims whole, and would

---

[13] Furthermore, in the typical case "there is probably no better way for [a monopolist] to guarantee that its dominance will be challenged than by greedily extracting the highest price it can." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 294 (2d Cir. 1979) (alteration added).

[14] Anticompetitive conduct is required to show antitrust injury and to allege monopolization claims. *See Philadelphia Taxi Ass'n, Inc v. Uber Techs., Inc.,* 886 F.3d 332, 338 (3d Cir. 2018). The Court therefore revisits this topic in Section IV.D.ii, *infra*.

[15] *Illinois Brick* involved indirect purchasers' use of the pass-on theory—allegations that an overcharge was "passed on" to them through the supply chain. 431 U.S. at 727. Without the pass-on theory, the indirect purchasers would not

discourage victims from bringing suits. Determining the overcharge any given indirect purchaser has "absorbed" is "difficult[]." *Id.* at 747 (alteration added). Allowing indirect purchasers would involve "tracing the effect of an overcharge on the [indirect] purchaser's prices, costs, sales, and profits." *Id.* at 745. This necessarily "would increase the overall costs of recovery by injecting extremely complex issues into the case." *Id.* The Supreme Court doubted that suits by indirect purchasers "would make individual victims whole for actual injuries suffered;" such suits would "simply deplet[e] the overall recovery." *Id.* at 747 (alteration added). As a result, "only a small fraction [of victims] would be likely to come forward to collect their damages," even if they brought a class action. *Id.* (alteration added). But even the class format might not help, because allowing indirect purchasers to bring suits "would transform [antitrust] treble-damages actions into massive multiparty litigations involving many levels of distribution and including large classes of ultimate consumers remote from the defendant." *Id.* at 740 (alteration added). Accordingly, the Supreme Court found it is better to give *direct* purchasers "the full extent of the overcharge paid by them" than to engage in a complex forensic accounting that would "apportion the overcharge among all that may have absorbed a part of it"—like indirect purchasers.[16] *Id.* at 746.

The Supreme Court continues to withhold antitrust standing for indirect purchasers and declines to create exceptions. It has reiterated that *Illinois Brick* "established a bright-line rule that authorizes suits by *direct* purchasers but bars suits by *indirect* purchasers." *Apple*, 587 U.S. at 289

---

have an antitrust injury and would therefore not have antitrust standing to sue. *Id.* While *Illinois Brick* facially concerns an indirect purchaser's use of the pass-on theory, it has come to stand for the general rule that indirect purchasers do not have antitrust standing. *See Apple Inc v. Pepper*, 587 U.S. 273, 289 (2019) (Kavanaugh, J.) (*Illinois Brick* "established a bright-line rule that authorizes suits by *direct* purchasers but bars suits by *indirect* purchasers") (emphasis in original).

[16] The Supreme Court had one additional reason for barring indirect purchaser suits. In a previous case, it ruled that antitrust defendants could not show a plaintiff's lack of injury by demonstrating the plaintiff passed on any overcharge. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968). Its *Hanover Shoe* reasoning was much the same: an unwieldy damages model and recovery depletion. *See generally id.* at 487–494. Allowing plaintiffs to use an indirect purchaser theory posed those same issues. 431 U.S. at 731–32. To avoid "a serious risk of multiple liability for defendants," as well as "unequal treatment of plaintiffs and defendants," the *Illinois Brick* Court declined to permit indirect purchaser standing. *Id.* at 730–31.

(emphasis in original). When asked to create exceptions it has refused to do so, including in suits against public utilities. *See Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 207–08 (1990) (rejecting three suggested reasons for an exception to *Illinois Brick*). Additionally, it has made clear that district courts are "not to 'carve out exceptions . . for particular types of markets.'" *Id.* at 216 (alteration added) (quoting *Illinois Brick*, 431 U.S. at 744). Rather, district courts should avoid the "unwarranted and counterproductive exercise to litigate a series of exceptions." *Id.* at 217. This is because "[t]he possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule." *Id.* at 216 (alteration added).

This leaves a "straightforward rule:" "if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A," yet "B may sue A if A is an antitrust violator," likewise "C may sue B if B is an antitrust violator." *Apple*, 587 U.S. at 280.

### 1.   The "Conspiracy Exception"—or Lack Thereof

RecoveryX requests an exception to that "straightforward rule." It asserts that the Fifth Circuit and other federal courts have recognized an exception where indirect purchasers have antitrust "standing to pursue an antitrust claim as long as it is a direct purchaser of *any* defendant involved in a common scheme of monopolistic conduct"—otherwise known as the "conspiracy" or "co-conspirator" exception. [Dkt. 47 at 14 (emphasis in original); Dkt. 58 at 9]. There are two problems with RecoveryX's request.

First, the Fifth Circuit has done no such thing. RecoveryX cites *In re Beef Industry Antitrust Litigation* as "acknowledge[ing] the conspiracy exception to the [in]direct purchaser rule." *Id.* at 14 (alterations added) (citing 600 F.2d 1148, 1163 (5th Cir. 1979). There, the Fifth Circuit stated:

> It is true that some courts have acknowledged [a conspiracy] exception. Whatever the merits of the arguments for such an exception in general, we do not think that the reasoning of *Illinois Brick* permits recognizing the exception when, as here, the alleged co-conspirator middlemen are not named as parties defendant.

600 F.2d at 1163 (alterations added) (citations omitted). Other than saying "some courts have acknowledged" it, the Fifth Circuit did not make a comment either way on the conspiracy exception. Mentioning the conspiracy exception is not the same as recognizing its merits. Moreover, given subsequent Supreme Court development of the indirect purchaser rule and antitrust standing generally in the years since *Beef Industry*, there are fewer reasons to adopt the exception.[17]

This leads to the second problem: the conspiracy exception contravenes much of the indirect purchaser rule's foundation.[18] In the first place, creating an exception runs afoul of the Supreme Court's specific instructions *not* to create exceptions. Moreover, one of the *Illinois Brick* Court's chief concerns was massive lawsuits. While the *Illinois Brick* Court was concerned about neigh-innumerable plaintiffs, the conspiracy exception has the potential to "transform [antitrust] treble-damages actions into massive multiparty litigations involving many levels of distribution and including large classes of [defendants] remote from the [plaintiff]." 431 U.S. at 740 (alterations added). Additionally, the exception would also completely deprive the indirect purchaser rule of its contents. If antitrust plaintiffs can simply add an alleged co-conspirator with the flourish of a pen, *Illinois Brick* poses no problem at all.

Because the indirect purchaser rule applies to RecoveryX's federal antitrust claims against SRMPA, and the conspiracy exception would not apply to save those claims, the Court declines to alter its prior Order.

---

[17] Cases after *UtiliCorp* have criticized the exception as "contradict[ing] the Supreme Court's admonition 'not to carve out exceptions to the [indirect] purchaser rule for particular types of markets.'" *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 755 n.7 (9th Cir. 2012) (alteration added) (quoting *UtiliCorp*, 497 U.S. at 216) (citation modified).

[18] Of course, *Illinois Brick*'s concerns regarding damages calculations may be irrelevant here, because Congress has already said RecoveryX cannot recover antitrust damages (including attorney's fees) from Livingston, and that statutory exception may include SRMPA also. *See supra* Section IV.A.

### C. The State Action Doctrine

RecoveryX asserts the Court erred in finding that the state action doctrine[19] bars its claims antitrust claims. [Dkt. 58 at 13]. The state action doctrine—also called *Parker* immunity—originates in the Supreme Court's *Parker v. Brown* decision. 317 U.S. 341 (1943). Derived from "principles of federalism and state sovereignty," the doctrine holds federal antitrust laws "[do] not apply to anticompetitive restraints imposed by the States 'as an act of government.'"[20] *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 370 (1991) (Scalia, J.) (alteration added) (quoting *Parker*, 317 U.S. at 352). The state action doctrine only applies "when it is clear that the challenged anticompetitive conduct is undertaken pursuant to a regulatory scheme that 'is the State's own.'" *F.T.C. v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 225 (2013) (quoting *F.T.C. v. Ticor Title Ins. Co.*, 504 U.S. 621, 635 (1992)).

Municipalities, like Livingston here,[21] "are not themselves sovereign," so *Parker* immunity "does not apply to them directly." *Id.* (citing *Omni Outdoor*, 499 U.S. at 370; *City of Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 411–13 (1978)). Rather, municipalities are immune "when they act 'pursuant to state policy to displace competition with regulation or monopoly public service.'" *Id.* (quoting *La. Power*, 435 U.S. at 413). This rule is intended to strike a balance between a state's ability "'to use their municipalities to administer state regulatory policies free of the inhibitions of the federal antitrust laws'" and the "'Nation's free-market goals.'" *Id.* at 226 (quoting *La. Power*, 435 U.S. at 415–16). However, that balance is titled in favor of antitrust's

---

[19] The term "state action" takes on a different, narrower meaning in antitrust cases than it does in the Fourteenth Amendment context.

[20] Immunity is a bit of a misnomer; *Parker* immunity "'is more accurately a strict standard for locating the reach of the Sherman Act than the judicial creation of a defense to liability for its violation.'" *Louisiana Real Est. Appraisers Bd. v. F.T.C.*, 976 F.3d 597, 605 (5th Cir. 2020) (quoting *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*, 171 F.3d 231, 234 (5th Cir. 1999)).

[21] The parties agree Livingston is a municipality. [Dkts. 35 at ¶¶ 1, 20–23, 27, 46 at 15].

14

application; the United States has "a regime of competition as the fundamental principle governing commerce," so "state-action immunity is disfavored." *La. Power*, 435 U.S. at 398–99; *Ticor*, 504 U.S. at 635.

*Parker* immunity will apply to a municipality[22] if the challenged activity has been "undertaken pursuant to a 'clearly articulated and affirmatively expressed' state policy to displace competition." *Phoebe Putney*, 568 U.S. at 226 (quoting *Cmty. Commc'ns Co., Inc. v. City of Boulder*, 455 U.S. 40, 52 (1980)). This standard is met "if the anticompetitive effect was the 'foreseeable result' of what the State authorized." *Id.* at 226–27 (quoting *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 42 (1985)). It is not required that the state legislature "'expressly state in a statute or its legislative history that the legislature intends for the delegated action to have anticompetitive effects.'" *Id.* at 226 (quoting *Town of Hallie*, 471 U.S. at 43).

### i.    *Texas Law Regulating Provision of Electricity*

The applicable state law determines whether *Parker* immunity applies. From the briefing, it appears Texas has two regimes for electric utilities: one deregulated and governed by the free market, and the other controlled through a traditional regulatory structure. Each is discussed in turn.

In its *deregulated* regime, Texas law prioritizes the value of free market competition in electrical services. TEX. UTIL. CODE § 39.001(a). Cities must opt in to the free market. *See id.* at § 40.051. Once they have opted in, "[r]egulatory authorities"—which are distinct from "the governing body of a municipally owned electric utility that has not opted for customer choice"— are to "authorize or order competitive rather than regulatory methods." *Id.* at § 39.001(d)

---

[22] The *Parker* test is the same for private parties, with an added "state supervision requirement." *See Phoebe Putney*, 568 U.S. at 226 (citing *Town of Hallie*, 471 U.S. at 46–47); *N. Carolina State Bd. of Dental Examiners v. F.T.C.*, 574 U.S. 494, 503–04 (2015). However, neither side argues that *Parker* should apply to SRMPA (to the extent it is a private party as opposed to a state actor, an unbriefed point). [Dkts. 58 at 13 (only mentioning Livingston), 61 at 2–4 (same)]. The Court accordingly applies the analysis to Livingston only.

(alteration added). These same "[r]egulatory authorities" cannot "make rules or issue orders regulating competitive electric services, prices, or competitors or restricting or conditioning competition except as authorized." *Id.* at § 39.001(c). There is a process for challenging as anticompetitive any actions "relating to customer choice." *Id.* at § 40.056(a).

Turn to the alternative: the traditional *regulated* system. Here, "the normal forces of competition that regulate prices in a free enterprise society do not operate." *Id.* at § 11.002(a). "Municipalities have original jurisdiction to regulate utilities within their territories," and accordingly have the power to set rates. *In re Oncor Elec. Delivery Co. LLC*, 630 S.W.3d 40, 45–46 (Tex. 2021) (interpreting and analyzing TEX. UTIL. CODE §§ 32.001, 33.001). The Public Utility Commission of Texas has "'exclusive appellate jurisdiction'" over "'rates, operations, and services of an electric utility in areas in the municipality.'" *Id.* at 45 (quoting TEX. UTIL. CODE §§ 32.001(b), 33.001(a)). A municipality's "order or ordinance . . . exercising exclusive original jurisdiction" can be appealed to the commission. TEX. UTIL. CODE §§ 32.001(b), 33.052. However, by an apparent loophole the commission does *not* have appellate jurisdiction over a municipally owned utility's rates when those rates are appealed by a municipality's inhabitants. *See* Tex. Att'y Gen. LO-H-812 (1976).[23]

---

[23] The Texas Attorney General's reasoning merits repeating:

> The appellate procedure described in [§ 33.052] applies to *rate* proceedings. [§ 11.003(16)(A)] defines "rate" as being charged by a "[electric or public] utility." Since [§§ 31.002, 51.002] provide[] that a municipally owned utility is not a "public utility" unless otherwise provided, the term "rate proceeding" contained in [§ 33.052] does not include a proceeding to establish rates of municipally owned utilities. . . In the absence of any language indicating an intent to make an exception to the definitions established by the legislature, it is not our prerogative to infer such an intent. Accordingly, we feel we have no choice but to state that under the present wording of the statute, rate-payers outside the municipality can appeal a decision in a proceeding to fix rates of municipally owned utilities, but a resident of the municipality may not. If a different result was intended, it must await further legislative clarification.

Tex. Att'y Gen. LO-H-812, 7–8 (1976) (alterations added to reflect current codification) (emphasis in original) (citation omitted) (citing 1975 Tex. Gen. Laws 2327). In the fifty years since 1976 the legislature has not changed the implicated language, so the Texas Attorney General's reasoning holds.

Because Livingston has not opted for the free market, the latter regulated system applies. [Dkts. 35 at ¶ 20, 46 at 18].

## ii.    *Challenged Conduct*

Given the above frame of reference, the Court now considers whether Livingston's conduct is "undertaken pursuant to a 'clearly articulated and affirmatively expressed' state policy to displace competition." *Phoebe Putney*, 568 U.S. at 226 (quoting *Cmty. Commc'ns*, 455 U.S. at 52).

RecoveryX, in its Response to Livingston's Motion to Dismiss, argues Livingston's decision to charge higher electric rates to offset *ad valorem* taxes is outside these statutes' scope. [Dkt. 48 at 12–13]. For RecoveryX, what matters is "whether [Livingston] exceeded its legislative authorization by using its excessive electric rate charges as a means to provide unfair property tax benefits that are unavailable to its non-property owners to fund items in its general budget wholly unrelated to the provision of electricity." *Id.* at 12 (alteration added). RecoveryX states *Parker* immunity is inappropriate because Livingston's conduct was not taken pursuant to an affirmatively expressed state policy. *Id.* Specifically, RecoveryX challenges two kinds of conduct: Livingston's decision to charge "excessive and unreasonably high rates," which "allow[s] the City to recover an unreasonable profit," and its choice "to fund general expenses and eliminate the ad valorem tax in the City." [Dkt. 35 at ¶ 45 (alteration added)].

First and foremost, the Court doubts these actions come within antitrust's ambit. Not every unfair deed is grounds for an antitrust case—a topic the Court already discussed above in Section IV.B.i, *supra*. If Livingston's conduct is not anticompetitive, then antitrust law has no place; if there is no antitrust suit, the state action doctrine does not apply anyway. So RecoveryX may ultimately be correct that the state action doctrine does not bar its claims against Livingston, but such would be a pyrrhic victory—for there would be no antitrust case in the first place.

17

Setting this aside and assuming supracompetitive prices are anticompetitive themselves, they are the "foreseeable result" of Texas's grant of authority to Livingston to set electricity rates. Texas has given municipalities the exclusive ability to control their rates. *Oncor*, 630 S.W.3d at 45–46 (Tex. 2021) (interpreting and analyzing TEX. UTIL. CODE §§ 32.001, 33.001). It is true that the Texas Public Utility Commission would not have appellate jurisdiction over this particular ratemaking. *See* Tex. Att'y Gen. LO-H-812 (1976). Ultimately, however, if a city's residents do not like their electric bills, they can petition their municipality to enter the free market. *See* TEX. UTIL. CODE § 40.051(a). The Court infers from this system that Texas anticipated supracompetitive prices and instituted countermeasures—including the ability to opt-out of a monopoly and into the free market.[24]

Turn to the second challenged activity: a lack of *ad valorem* taxes. It is natural that a city making a profit on electricity sales would choose to charge lower taxes or levy none whatsoever. This strategy may give the city a competitive advantage over others in attracting new residents. While understandable, the Court is unsure this is the kind of "foreseeable result" Texas had in mind when it granted municipalities the ability to control their own rates. However, it is not an "anticompetitive effect" either, as *Phoebe Putney* requires.[25] 568 U.S. at 226. For these two reasons RecoveryX may be right that the state action doctrine does not protect Livingston on this front; but RecoveryX's lawsuit fails anyway because this is not an antitrust concern. *See infra* Section IV.D.ii.

---

[24] In addition to opting out, even the *prospect* of a city's opt-out could control prices. A wise utility may note its customers' discontent and adjust its prices accordingly, lest it lose its monopoly at the hands of the voting public.

[25] Technically, the state action doctrine requires that "the *anticompetitive effect* was the 'foreseeable result' of what the State authorized." *Phoebe Putney*, 568 U.S. at 226 (emphasis added) (quoting *Town of Hallie*, 471 U.S. at 43). Thus, the state action doctrine does not apply when there is no "anticompetitive effect"—but then again, the antitrust laws would not apply either in such a case, so it is a moot point. Here, Livingston's decision not to charge *ad valorem* taxes is not anticompetitive, nor does it have an anticompetitive effect (points the Court considers in full below). Accordingly, the state action doctrine does not bar the claims against Livingston; nevertheless, those claims fail because there is no anticompetitive conduct, so RecoveryX's federal claims are dismissed regardless.

The Court therefore declines to alter its prior Order.

### D.  Failure to State Claims

Aside from requesting relief that cannot be granted, a lack of antitrust standing, and the state action doctrine, the Third Amended Complaint fails to allege federal antitrust claims—specifically, violations of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. Each claim is discussed separately.

### i.    *Claims under Sherman Act Section 1 and Clayton Act Section 3*

RecoveryX alleges *monopolization* under Section 1 of the Sherman Act and Section 3 of the Clayton Act. [Dkt. 35 at ¶¶ 49, 61]. The Third Amended Complaint has a few issues and ambiguities worth discussing before RecoveryX's claims can be analyzed.

### 1.  *Specific Claims in the Third Amended Complaint*

As an initial matter, it is not clear what claims RecoveryX alleged. Consider first the alleged Sherman Act violation, a point on which RecoveryX makes conflicting allegations. It first states the Defendants *already* "possess monopoly power over the relevant product and goegraphic [*sic*] market." [Dkt. 35 at ¶ 49]. If the Defendants already have monopoly power, an actual monopolization claim may be appropriate. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966) (indicating the first element of such a claim is "the possession of monopoly power in the relevant market"); *Trinko,* 540 U.S. at 407 (2004) (citing *Grinnell*, 384 U.S. at 570–71) (same). However, a few sentences later in the same paragraph, RecoveryX argues "there is a dangerous probability that the defendants may achieve monopoly power in the relevant market." *Id.* "Dangerous probability" suggests an *attempted* monopolization claim. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) (discussing and reaffirming the "dangerous probability" of monopolization as a key element in attempted monopolization cases). Furthermore, the Third

19

Amended Complaint does not state whether RecoveryX brings an *actual* monopolization or an *attempted* monopolization claim under Section 1, which matters because the elements are different for each claim.

Whichever claim RecoveryX intended to state, however, neither is brought under Section 1 of the Sherman Act. Both actual monopolization/monopoly maintenance and attempted monopolization claims are brought under Section 2, which punishes "[e]very person who shall monopolize, or attempt to monopolize." 15 U.S.C. § 2 (alteration added). *See also* 15 U.S.C. § 1 (forbidding "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce") (alteration added). While one may commit Section 1 and Section 2 offenses via the same conduct, they remain separate offenses.

The Clayton Act claim suffers similar issues. The header refers to "Monopolization in violation of Section 3 of the Clayton Act." [Dkt. 35 at ¶ 61]. But the Clayton Act does not reach monopolization; Section 2 of the Sherman Act does. Nonetheless, in this "monopolization" section the Third Amended Complaint describes "tying agreements." *Id.* The Clayton Act prohibits the

> sale of goods . . . on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . of a competitor . . . of the lessor or seller, where the effect of such . . . understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14 (alterations added). Section 3 of the Clayton Act is therefore understood to forbid "tying arrangements," whereby a seller uses its control over a desired product to force a purchaser to buy another, less-desired or completely-unwanted product. From its use of "tying agreements," the Court understands RecoveryX to be making a Clayton Act tying claim.

Elsewhere in the Third Amended Complaint, but not described among its causes of action, RecoveryX argues that the "tying agreements" also violate Section 1 of the Sherman Act. [Dkt. 35 at ¶ 31]. The Court therefore understands RecoveryX to have also made a Sherman Act Section 1 tying claim.

Having discerned the Third Amended Complaint's claims, the Court now analyzes them.

*2. Analysis–No Tying Alleged*

Because of a blurred distinction between Sherman Act Section 1 and Clayton Act Section 3 tying claims, one framework applies to both statutes.[26] To show a *per se* illegal[27] tying arrangement, a plaintiff must show four elements: "(1) the tying and tied goods are two separate products; (2) the defendant has market power in the tying product market; (3) the defendant affords consumers no choice but to purchase the tied product from it; and (4) the tying arrangement forecloses a substantial volume of commerce." *Microsoft*, 253 F.3d at 85 (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 461–62 (1992) [hereinafter *Eastman Kodak*]; *Jefferson Par.,* 466 U.S. at 12–18). In a Clayton Act Section 3 tying case, a fifth element applies:

---

[26] The only Supreme Court case to the contrary is *Times-Picayune Publishing Company v. United States*. 345 U.S. 594 (1953). There, the Court implied the two statutes imposed two different tying standards. *Id.* at 608–09 ("When the seller enjoys a monopolistic position in the market for the 'tying' product, or if a substantial volume of commerce in the 'tied' product is restrained, a tying arrangement violates the narrower standards expressed in § 3 of the Clayton Act because from either factor the requisite potential lessening of competition is inferred. And because for even a lawful monopolist it is 'unreasonable, per se, to foreclose competitors from any substantial market', a tying arrangement is banned by § 1 of the Sherman Act whenever both conditions are met."). The Supreme Court, in the tying cases since *Times-Picayune*, has never revisited that distinction and even seems to have suggested the opposite. *See Moore v. James H. Matthews & Co.*, 550 F.2d 1207, 1214 (9th Cir. 1977) ("The practical difference between the two standards has eroded steadily since Justice Clark's attempt to draw a fine line of distinction in *Times-Picayune*. This trend culminated in the opinion in [*Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495 (1969)] suggesting that the standards are virtually identical.") (alteration added) (citations omitted).

[27] Tying arrangements may be found unlawful under either form of antitrust analysis—a *per se* rule or the rule of reason. In antitrust cases generally, if a challenged activity is not *per se* unlawful—which is nearly always the result—the rule of reason applies as the default antitrust standard. *See Jefferson Par. Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 29 (1984) (first discussing a tying arrangement under the *per se* standard, then evaluating it under the rule of reason); *United States v. Microsoft Corp.*, 253 F.3d 34, 90–93 (D.C. Cir. 2001) (similar). *See also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885–87 (2007) (discussing the per se and rule of reason analyses generally). The Supreme Court has refused to reconsider tying arrangements' *per se* illegality status, but it has found in some cases that certain arrangements fall short of meeting the elements of a tying claim, and therefore are not *per se* illegal. *Jefferson Par.*, 466 U.S. at 9 ("It is far too late in this history of our antitrust jurisprudence to question the proposition that certain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable 'per se.'"). In such situations it has used the rule of reason analysis. *Id.* at 29. Because RecoveryX did not argue the tying arrangement here would violate the rule of reason, the Court does not undertake that analysis.

21

that both the tying and the tied products are commodity goods.[28] *See* 15 U.S.C. § 14 (application to "goods, wares, merchandise, machinery, supplies, or other commodities").

For a court to find "two distinct products," it must consider whether there is "sufficient consumer demand so that it is efficient for a firm to provide [one product] separately from [the other]." *Eastman Kodak*, 504 U.S. at 462 (alterations added) (citing *Jefferson Par.*, 466 U.S. at 21–22). It is not the "functional relation between" the two products that is important; it is "the character of the demand for the two items." *Jefferson Par.*, 466 U.S. at 19.

RecoveryX failed to allege two products. RecoveryX's alleged "tied" product is the "capacity charges, transmission charges, imbalance charges or credits, energy charges or fuel charges, or other charges." [Dkt. 35 at ¶ 61]. RecoveryX never specified what the "tying" product is, but the Court infers from the Third Amended Complaint that electricity is the tying product. [*See generally id.*]. The Court simply cannot fathom a situation in which a customer does not want electricity but will, for example, buy only "transmission charges." The same reasoning extends to the other charges. Without consumer demand for the other charges, there is only one product: electricity. For this reason alone RecoveryX's tying claims fail.

Even if electricity and the charges were considered distinct, the Clayton Act claim fails for an independent reason. As previously mentioned, the Act only reaches commodity goods, not services. 15 U.S.C. § 14. It follows that in a Clayton Act tying case *both* the tying and the tied products must be commodity goods. *Crossland v. Canteen Corp.*, 711 F.2d 714, 719 n.1 (5th Cir.

---

[28] A sixth element may be noted: while the Sherman Act applies where interstate commerce is affected, the Clayton Act only touches activities in commerce. *Compare* 15 U.S.C. §§ 1, 2 ("of trade or commerce among the several States") *with* 15 U.S.C. § 14 (prohibiting "any person engaged in commerce, the course of such commerce, to lease or make a sale . . ."). This is a distinction without a difference for present purposes; nevertheless, it may be relevant in other tying cases.

1983) (citing 15 U.S.C. § 14). To the extent the extra charges reflect *services*, as opposed to *goods*, the Clayton Act has no place.[29]

The Court accordingly declines to alter its prior Order as to these claims.

### ii.    *Monopolization under Section 2 of the Sherman Act*

In the Third Amended Complaint, RecoveryX alleges the Defendants "possess monopoly power in the relevant market," and "willfully acquire and maintain monopoly power by engaging in anticompetitive and exclusionary conduct over a relevant market."[30] [Dkt. 35 at ¶ 55]. From these statements, the Court believes RecoveryX to have stated an *actual* monopolization or monopoly maintenance claim.[31]

Actual monopolization requires that a plaintiff show "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 570–71; *Trinko*, 540 U.S. at 407 (citing *Grinnell*, 384 U.S. at 570–71). Both halves must be shown; "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Trinko*, 540 U.S. at 407 (emphasis in original).

---

[29] The Court also questions whether electricity is a commodity good.

[30] RecoveryX also alleges that the defendants had a "specific intent to monopolize, and by their actions, achieved monopoly power in the relevant market." [Dkt. 35 at ¶ 58]. Specific intent is only relevant to *attempted* monopolization claims. *Compare Spectrum Sports*, 506 U.S at 456 (providing elements of an attempted monopolization claim) *with Grinnell*, 384 U.S. at 570–71 (providing elements of an actual monopolization claim) *and Trinko*, 540 U.S. at 407 (citing *Grinnell*, 384 U.S. at 570–71) (same). *See also United States v. Aluminum Co. of America*, 148 F.2d 416, 432 (2d Cir. 1945) (Hand, J.) (explaining specific intent is "an intent which goes beyond the mere intent to do the act"). However, in an actual monopolization case "intent is merely relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive.'" *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985) (Stevens, J.). In the Fifth Circuit "the law is well established that the distinction between the two offenses is the specific intent requirement in [attempted monopolization] cases." *Dimmitt Agri Indus., Inc. v. CPC Int'l Inc.*, 679 F.2d 516, 531 (5th Cir. 1982).

[31] RecoveryX does not directly indicate the flavor of its "monopolization" claim—actual or attempted. [Dkt. 35 at ¶¶ 55–60]. When asked at the February 19 hearing, RecoveryX did not clarify which claim it alleged.

The first element, "Monopoly power"[32] is "'the power to control prices or exclude competition.'" *Microsoft*, 253 F.3d at 51 (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)). "In other words, 'a firm is a monopolist if it can profitably raise prices substantially above the competitive level.'" *F.T.C. v. Facebook, Inc.*, 581 F. Supp. 3d 34, 43 (D.D.C. 2022) (quoting *Microsoft*, 253 F.3d at 51). In the typical case there is no "direct proof" of such an ability, so courts may "'examine market structure in search of circumstantial evidence of monopoly power.'" *Id.* (quoting *Microsoft*, 253 F.3d at 51). This circumstantial evidence is "the existence of (1) a relevant antitrust market, in which the defendant holds (2) a dominant market share, protected by (3) barriers to the entry of rivals." *F.T.C. v. Meta Platforms, Inc.*, 775 F. Supp. 3d 16, 34 (D.D.C. 2024).

Whether the court takes the direct or the indirect route, actual monopolization requires the identification of a "relevant market," which itself includes two components: a geographic market and a product market. It is not necessary for an antitrust plaintiff to define the geographic market (especially at the motion to dismiss stage) "by metes and bounds." *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974). However, the plaintiff must designate a geographic market that reflects "the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961); *Meta Platforms*, 775 F. Supp. 3d at 35.

Defining the relevant product market is a form "of art in antitrust analysis." *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 50 (D.D.C. 2011). "'The outer boundaries of a product market are determined by the reasonable interchangeability of use [by consumers] or the cross-elasticity of demand between the product itself and substitutes for it.'" *Id.* (alteration in original) (quoting *Brown Shoe*, 370 U.S. at 323). "'In other words, courts look at whether two products can

---

[32] Not to be confused with a similar antitrust term, "market power."

be used for the same purpose, and, if so, whether and to what extent purchasers are willing to substitute one for the other.'" *Facebook*, 581 F. Supp. 3d at 44 (quoting *H & R Block*, 833 F. Supp. 2d at 51).

For an actual monopolization/monopoly maintenance claim to be viable, a plaintiff must also allege "willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 570–71 (alteration added); *Trinko*, 540 U.S. at 407 (citing *Grinnell*, 384 U.S. at 570–71). Justice Scalia underscored the importance of this second element when he wrote in *Trinko*:

> The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices—at least for a short period—is what attracts "business acumen" in the first place; it induces risk taking that produces innovation and economic growth. To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*.

540 U.S. at 407 (emphasis in original). The exact content of the "willful acquisition" component differs from case to case depending on the specific alleged anticompetitive conduct. The common theme, however, is that "[a]nticompetitive conduct is 'the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 529 (5th Cir. 2022) (Oldham, J.) (alteration added) (quoting *Eastman Kodak*, 504 U.S. at 482–83).

### 1. *Analysis—No Anticompetitive Conduct*

RecoveryX asserts the Defendants have monopoly power over the relevant geographic and product markets.[33] [Dkt. 35 at ¶¶ 55, 58]. Both Defendants agree that they have monopoly power

---

[33] RecoveryX defines the relevant geographic market as "the City of Livingston's service territory in Polk County in the state of Texas and the SRMPA service territory." [Dkt. 35 at ¶ 58]. As to the relevant product market RecoveryX alleges:

over the relevant market (as RecoveryX has defined that market) for present purposes. [Dkts. 61 at 4, 62 at 8]. The real dispute is over the second element, "willful acquisition or maintenance of that power." *Grinnell*, 384 U.S. at 570–71; *Trinko*, 540 U.S. at 407 (citing *Grinnell*, 384 U.S. at 570–71).

RecoveryX argues in its Motion that the Third Amended Complaint contains a few theories of anticompetitive conduct:

1.  As part of the Cambridge Project, [SRMPA] entered into contracts with [Livingston] containing exclusivity clauses which had the predatory and anticompetitive effect of barring [Livingston] from purchasing any commodity goods from competitors.[34]

2.  The Cambridge Project enabled [Livingston] and [SRMPA] to sell electricity "for profit" to large industrial clients.[35]

3.  The Cambridge Project required [Livingston] and [SRMPA] to acquire some exclusive services from Entergy as part of the quid pro quo for the profits which they received from the project, helping the [Livingston] and [SRMPA] to solidify their monopoly power in the market and reflecting a specific intent to monopolize.[36]

4.  [Livingston] intentionally created a conflict of interest in allowing some of its officials to serve as board members of [SRMPA].[37]

5.  [Livingston] has passed some of the profits it has received from the Cambridge Project to real property owners in the form of property tax deductions, which benefit only those [Livingston] residents who are real property owners; and [Livingston], by touting those deductions publicly, has demonstrated its specific intent to monopolize the market.[38]

_____

the delivery and sale of electric power (energy charges, transmission charges, capacity charges, fuel charges, ancillary services charges, imbalance charges, and other contract related charges (each a relevant and disparate market)) to residential and commercial consumers within the City of Livingston's service territory and the SRMPA service territory.

*Id.*

[34] [Dkt. 58 at 18 (alterations added) (citing Dkt. 35 at ¶¶ 28, 34–35)].

[35] *Id.* (alterations added) (citing Dkt. 35 at ¶¶ 29–30).

[36] *Id.* (alterations added) (citing Dkt. 35 at ¶¶ 30–31).

[37] *Id.* (alterations added) (citing Dkt. 35 at ¶ 32).

[38] *Id.* (alterations added) (citing Dkt. 35 at ¶ 33).

Some of these are improper from the start because they are not anticompetitive conduct at all—specifically, RecoveryX's second, fourth, and fifth theories. The Court already established that high prices are not anticompetitive in and of themselves. *See supra* Section IV.B.i. Neither are conflicts of interest on part of city officials; in fact, they are often protected by *Parker* immunity. *See generally Omni Outdoor,* 499 U.S. at 376–78 (alteration added) (rejecting a suggested "conspiracy" exception to *Parker* immunity and reasoning that "[f]ew governmental actions are immune from the charge that they are 'not in the public interest' or in some sense 'corrupt'"). A policy decision that "benefits some segments of the society and harms others" is not anticompetitive *ipso facto* either. *Id.* at 377. Ultimately, "[e]ven unlawful conduct is 'of no concern to the antitrust laws' unless it produces an anticompetitive effect.'" *Philadelphia Taxi*, 886 F.3d at 338 (alteration added) (quoting *Brunswick*, 429 U.S. at 487).

Even if all five theories described anticompetitive conduct, an additional consideration in this particular case gives the Court pause: Texas law prevents market entry. "The Supreme Court has time and again reminded us that analysis 'resting on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law.'" *Pulse Network*, 30 F.4th at 493 (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018)) (citation modified).[39] It "has often announced that each case arising under the Sherman Act must be determined upon the particular facts disclosed by the record." *Maple Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 579 (1925); *Eastman Kodak*, 504 U.S. at 467 (quoting *Maple Flooring*, 268 U.S. at 579). Because Texas law declares monopoly by fiat in electricity provision, and Livingston has not opted out of that arrangement, no competitors can enter the market regardless of what Livingston and SRMPA do.[40]

---

[39] While *Pulse Network* and *American Express* provided this caution in the market definition context, it is no less applicable here in a general sense. *See Maple Flooring*, 268 U.S. at 579 (implying the same concept is generally relevant).

[40] This monopoly-by-default is an additional reason the state action doctrine should bar this case (at the very least against Livingston).

Under these circumstances, RecoveryX cannot show that any of these five forms of conduct would tend "to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" *BRFHH Shreveport*, 49 F.4th at 529 (quoting *Eastman Kodak*, 504 U.S. at 482–83).

The Court accordingly declines to alter its Order.

## V.  CONCLUSION

In accordance with the above, the Court therefore **DENIES IN ITS ENTIRETY** Plaintiff RecoveryX Livingston L.L.C.'s Rule 59(e) Motion to Alter or Amend the Judgment and, Alternatively, Rule 54 Motion for Reconsideration and Motion to Certify Interlocutory Appeal. [Dkt. 58].

It is further **ORDERED** that the remaining state-law claims in this case are **REMANDED** back to the 258th Judicial District Court of Polk County, Texas, and the Parties shall bear their own attorney's fees and costs herein.

**SIGNED this 24th day of March, 2026.**

_____
Michael J. Truncale
United States District Judge

28